[Nos. 27677-1-II; 28093-1-II.   Division Two.   May 20, 2003.]

THE STATE OF WASHINGTON, *Respondent*, v. THOMAS RAY HORTON, *Appellant*.

*In the Matter of the Personal Restraint of* THOMAS RAY HORTON, *Petitioner*.

*James E. Lobsenz* (of *Carney Badley Spellman*), for appellant/petitioner.

*Gerald A. Horne, Prosecuting Attorney,* and *Kathleen Proctor* and *John M. Neeb, Deputies,* for respondent.

MORGAN, J. — Thomas Ray Horton was convicted of rape of a child and child molestation. In this consolidated appeal and personal restraint petition (PRP), he claims, among other things, that he was ineffectively assisted by counsel. We grant the PRP and remand for new trial.

In early 1999, S.S. and Horton lived in the same home. S.S., then age 13, told a friend that Horton had sexually abused her. The friend's mother helped her record the allegations on a cassette tape, which S.S. then played for her own mother, K.K. K.K. played the tape for Horton, who agreed to move out. No one notified the authorities at that time.

In April 1999, "a mandated reporter" informed CPS that S.S. might be a victim of abuse.[1] On July 2, 1999, S.S. was interviewed by Caryn Bujnowski, a child forensic interviewer with the Pierce County Prosecutor's Office. On July 13, 1999, S.S. was interviewed by Judy White, an investigator with Child Protective Services (CPS). On July 14, 1999, S.S. was physically examined by Dr. Yolanda Duralde, who found "penetrating trauma to the hymen."[2] S.S. told Dr. Duralde that Horton had touched her sexually and that she had not been sexually active with anyone else. Dr. Duralde thought that S.S. had been sexually abused, but CPS concluded that the allegations were unfounded.

Thirteen months later, on August 18, 2000, the State charged Horton with rape of a child in the first degree (Count I) and child molestation in the first degree (Count II). S.S. was the alleged victim in each count.

A jury trial began on April 2, 2001. S.S. testified that Horton had engaged her in vaginal intercourse, anal intercourse, and cunnilingus. He generally had acted after school, while K.K. was still at work. He had begun when S.S. was seven or eight and continued for two or three years. S.S. had been too ashamed to tell anyone until, when she was 13, she told her friend.

Horton denied any abuse. He said he had been working two jobs, often did not get home until 6 or 7 in the evening, and had not usually been home after school.

White testified that Horton had cooperated with CPS, although he had denied S.S.'s allegations. Tiffani Hughes, a friend of S.S.'s since elementary school, testified that S.S.'s reputation for truthfulness was "[n]ot very good."[3] Hughes' parents both testified that S.S. had come to their house almost every day after school because no one was home at her house.

---

[1] Report of Proceedings (RP) at 305.

[2] RP at 144; Clerk's Papers (CP) at 136.

[3] RP at 413.

On April 12, 2001, the jury found Horton guilty on both counts. On July 18, 2001, through new counsel, Horton moved for a new trial on the ground that his attorney had rendered ineffective assistance. He also moved for an order extending the time within which to file his motion for new trial. After denying both motions, the trial court imposed concurrent sentences of 160 months on Count I and 89 months on Count II. Horton responded with both a direct appeal and a PRP, which we consolidated.

██ ██ The dispositive issue is whether defense counsel rendered ineffective assistance.[4] Horton has the burden of showing ineffective assistance.[5] To meet this burden, he must show (1) deficient performance and (2) resulting prejudice.[6] We discuss deficient performance first, and resulting prejudice second.

## I.

██ In general, performance is deficient when it falls below an objective standard of reasonableness,[7] but not when it is undertaken for legitimate reasons of trial strategy or tactics (i.e., for the defendant's ultimate benefit).[8] According to Horton, his counsel rendered deficient performance in two ways: (A) by failing to introduce pretrial statements in which S.S. admitted sexual activity with a former boyfriend, and (B) by failing to object to improper remarks by the prosecutor. We turn to the first of these claims.

---

[4] The other issues that Horton raises are either repetitive or immaterial to the outcome of this review. Hence, we omit them from this opinion.

[5] *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995).

[6] *McFarland*, 127 Wn.2d at 334-35.

[7] *McFarland*, 127 Wn.2d at 334.

[8] *State v. McNeal*, 145 Wn.2d 352, 362, 37 P.3d 280 (2002).

## A.

On July 13, 1999, Judy White, the CPS investigator, spoke with S.S. and K.K. S.S. told White that "she'd been having sexual intercourse with a boy[.]"[9]

On February 13, 2001, defense counsel interviewed Tiffani Hughes. Hughes said that about two years earlier, she and S.S. had discussed whether S.S. had been sexually active with a former boyfriend, M.P. According to notes that defense counsel took at that time, S.S. said "that [M.P.] digitally penetrated her vagina[.] 'Finger-banged[.'] [S.S.] told her this 2 years ago[.] She was bragging about this[.] She and [M.P.] had gone on a trip w[ith] church youth group[.]"[10]

At trial, in the State's case in chief, the prosecutor asked S.S., during direct examination: "Prior to . . . your physical examination [by Dr. Duralde] . . . had you engaged in any sexual intercourse with a person other than the defendant?"[11] S.S. answered using only one word: "No."[12] Defense counsel then asked S.S., during cross-examination: "You told the prosecutor this morning that you had not engaged in sexual intercourse with anyone other than Mr. Horton; correct?"[13] After an intervening objection, S.S. again answered: "No."[14] Defense counsel did not ask S.S. to explain or deny her pretrial statements to White and Hughes, nor did she ask the court to have S.S. remain in attendance after testifying.[15]

---

[9] RP at 258; *see also* RP at 266 (S.S. "disclosed . . . that she had been sexually active with her boyfriend").

[10] CP at 137.

[11] RP at 79.

[12] RP at 79.

[13] RP at 102.

[14] RP at 102.

[15] *See* CrR 6.12(b), which provides that "[a] witness subpoenaed to attend in a criminal case is dismissed and excused from further attendance as soon as he or she has given his or her testimony-in-chief and has been cross-examined thereon,

Later, in the defense case in chief, defense counsel wanted to call White and Hughes to relate S.S.'s pretrial statements about sexual activity with M.P. and others. Out of the presence of the jury, the State moved to exclude such testimony. The trial court sustained because defense counsel had not complied with ER 613(b).[16]

ER 613(b) provides that extrinsic evidence of a prior inconsistent statement is not admissible in the absence of a proper foundation. The rule states in part that "[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon . . . ."

ER 613(b) was copied verbatim from Federal Rule of Evidence (FRE) 613(b). The drafters of the federal rule commented:

> The familiar foundation requirement that an impeaching statement first be shown to the witness before it can be proved by extrinsic evidence is preserved but with some modifications. . . . The traditional insistence that the attention of the witness be directed to the statement on cross-examination is relaxed in favor of simply providing the witness an opportunity to explain and the opposite party an opportunity to examine on the statement, *with no specification of any particular time or sequence*. . . .[17]

A recent text summarizes these federal modifications. It explains:

> Under the traditional common law rule, a foundation had to be laid with the witness being impeached before extrinsic evidence of the witness' prior inconsistent statement could be introduced. The impeaching attorney could freely ask the witness who made the statement about it without any founda-

---

unless either party . . . requests in open court that the witness remain in attendance[.]"

[16] CP at 231-32.

[17] 56 F.R.D. 183, 278-79 (1973) (emphasis added) (citations omitted).

tion. But if the attorney wanted to bring in another witness to describe the statement—i.e., to use extrinsic evidence—then a foundation had to be laid by giving the witness who made the statement the opportunity to explain or deny the statement on the witness stand. This was done by calling the witness' attention to the statement and the surrounding circumstance. A typical formulation of the requirement provided that "the [impeaching] statements must be related to him, with the circumstances of times, places, and persons present; and he shall be asked whether he has made such statements, and if so, allowed to explain them."

The foundation requirement was designed to give the witness a fair chance to explain any circumstances, such as duress or influence, that might excuse the inconsistency; to reconcile the statements by explaining why they were not really inconsistent; or to deny having made the statement at all. The foundation requirement was also intended to require that the impeacher seek first to authenticate the inconsistent statement through the witness who made it. In many cases, this would obviate the need to call another witness to authenticate the statement.

The federal foundation requirement is more relaxed than its common law counterpart. Federal Rule of Evidence 613(b) provides that extrinsic evidence of a prior inconsistent statement is not admissible "unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require." This rule might at first glance seem to be the same as the common law requirement, but it is not. The advisory committee's note points out that the rule does not specify any particular time at which the witness must be given the opportunity to explain or deny. With this in mind, some courts have held that the rule is satisfied even if the witness is not asked about the prior statement on the stand, so long as the witness is still available. The reasoning in support of this position is that the witness has the opportunity to explain or deny so long as the witness could be recalled for additional testimony. The federal liberalization has

not been universally accepted, even by states that use the Federal Rules as a model.[18]

In *State v. Johnson*,[19] we held that ER 613(b) incorporates the Federal Rules' new and more relaxed foundational standard. We said:

> Prerule case law required the examiner, before introducing extrinsic evidence of a prior inconsistent statement, to direct the declarant's attention to the exact content of the allegedly contradictory statement as well as to the time and place where the declarant made the statement and to the persons present. Under ER 613(b), however, it is sufficient for the examiner to give the declarant an opportunity to explain or deny the statement, either on cross-examination or after the introduction of extrinsic evidence.[20]

■ In this case, defense counsel wanted to impeach S.S.'s trial testimony that she had not had sexual intercourse with anyone other than Horton. Counsel wanted to do that by calling two extrinsic witnesses, White and Hughes, each of whom would say that S.S., before trial, had acknowledged sexual activity with others. Before counsel could do that, she had to give S.S. an opportunity to explain or deny her pretrial statements by calling them to S.S.'s attention while S.S. was on the stand, or by arranging for S.S. to remain in attendance after testifying. She failed to do that, according to the trial record and to an affidavit that counsel submitted after trial. Nothing in the affidavit shows why she failed to do that, and the State says only that "trial counsel must have had a reason for not attempting to lay foundation to impeach S.S. with prior statements about sexual behavior."[21] The record shows that noncompliance with ER 613(b) was entirely to Horton's detriment; that

---

[18] ROGER C. PARK ET AL., EVIDENCE LAW 436-37 (1998).

[19] 90 Wn. App. 54, 950 P.2d 981 (1998).

[20] *Johnson*, 90 Wn. App. at 70. Washington's prerule law can be found in *May v. Wright*, 62 Wn.2d 69, 72, 381 P.2d 601 (1963), and *Webb v. City of Seattle*, 22 Wn.2d 596, 610, 157 P.2d 312 (1945).

[21] PRP Br. of Resp't at 8.

compliance with ER 613(b) would have been *only* to his benefit; and thus that counsel's noncompliance could not have been a strategy or tactic designed to further his interests. Holding that an objectively reasonable attorney would have complied with ER 613(b) under the circumstances here, we conclude that defense counsel's performance fell below an objective standard of reasonableness.

The State relies on RCW 9A.44.020, the rape shield statute. It argues that "prior inconsistent statements about past sexual behavior are not admissible for any purpose in a child sex case[,]"[22] and that "it cannot be deficient performance when an action not taken was an action not allowed."[23]

RCW 9A.44.020(2) states in part that "[e]vidence of the victim's past sexual behavior . . . is inadmissible on the issue of credibility[,]"[24] except "when the prosecution presents evidence in its case in chief tending to prove the nature of the victim's past sexual behavior[.]"[25] The exception is codified in RCW 9A.44.020(4), which we hereafter refer to as subsection (4).

Subsection (4)'s exception applies here. The State opened the subject of S.S.'s past sexual behavior when, while directly examining her in its case in chief, it asked whether she had engaged in sexual intercourse with anyone other than Horton. When she answered "no," she implied that Horton had caused the "penetrating trauma" to her hymen. Horton had a right to respond through cross-examination,[26]

---

[22] PRP Br. of Resp't at 9-10 n.8.

[23] PRP Br. of Resp't at 8.

[24] RCW 9A.44.020(2); *see also* RCW 9A.44.020(3). Subsection (3) repeats this ban, but only for prosecutions in which consent is potentially an issue (i.e., rape, attempted rape, assault with intent to rape).

[25] RCW 9A.44.020(4). Subsection (4) additionally states that "the court may require a hearing pursuant to subsection (3)[.]" Subsection (3) requires a hearing when the issue is consent. Consent is not in issue here. Thus, we omit subsection (4)'s additional language.

[26] *See State v. Gefeller*, 76 Wn.2d 449, 455, 458 P.2d 17 (1969) ("when a party opens up a subject of inquiry on direct or cross-examination, he contemplates that

and "[n]othing"[27] in the rape shield statute abridged that right.

We would reach the same result even if subsection (4)'s exception did not apply. In *State v. Carver*,[28] the defendant was charged with sex offenses involving his two young stepdaughters. Each girl knew more about sexual matters than a child her age should have. "[T]o rebut the inference that the only way two young girls would have knowledge of such sexual matters was because the defendant had sexually abused them as charged[,]"[29] the defendant offered evidence that each girl had previously been abused by two other men. In addition, after one of the girls gave testimony that the defendant had molested her, the defendant wanted to impeach her by showing that she had said, before trial, that *only* her grandfather had molested her.

In one of two rulings pertinent here, this court held that although RCW 9A.44.020 applied when evidence of past sexual behavior was offered to attack credibility by showing a propensity for sexual contact, RCW 9A.44.020 did not apply when evidence of past sexual behavior was offered to explain an abnormally high level of sexual knowledge.[30]

---

the rules will permit cross-examination or redirect examination ... within the scope of the examination in which the subject matter was first introduced").

[27] RCW 9A.44.020(4).

[28] 37 Wn. App. 122, 678 P.2d 842, *review denied*, 101 Wn.2d 1019 (1984).

[29] *Carver*, 37 Wn. App. at 123.

[30] Federal law is in accord. Federal Rule of Evidence 412, the federal courts' version of a rape shield statute, generally excludes "[e]vidence offered to prove that any alleged victim engaged in other sexual behavior[,]" as well as "[e]vidence offered to prove any alleged victim's sexual predisposition." FRE 412(a). In criminal cases, however, FRE 412 expressly permits "evidence of specific instances of sexual behavior by the alleged victim offered to prove that a person other than the accused was the source of semen, injury or other physical evidence[.]" FRE 412(b)(1)(A). *Compare also Michigan v. Lucas*, 500 U.S. 145, 149, 111 S. Ct. 1743, 114 L. Ed. 2d 205 (1991) (rape shield statute "unquestionably implicates the Sixth Amendment" because "defendant's ability to confront adverse witnesses and present a defense is diminished"; Sixth Amendment *requires case-by-case determination); Olden v. Kentucky*, 488 U.S. 227, 232, 109 S. Ct. 480, 102 L. Ed. 2d 513 (1988) (right of confrontation violated by trial court's exclusion of impeaching evidence that had "strong potential to demonstrate the falsity" of alleged victim's testimony); *Davis v. Alaska*, 415 U.S. 308, 319, 94 S. Ct. 1105, 39 L. Ed. 2d 347

Based on "general evidentiary principles of relevance,"[31] we concluded:

> Defendant offered the evidence, not to attack the character of the little girls, but rather to rebut the inference they would not know about such sexual acts unless they had experienced them with defendant. Without the evidence the jury logically could draw the inference that they were conversant with such things only because defendant was guilty as charged. Consequently, the evidence was extremely relevant to defendant's defense, and its exclusion unfairly curtailed defendant's ability to present a logical explanation for the victims' testimony.[32]

In the second ruling pertinent here, this court held that RCW 9A.44.020 did not apply when the *prior statement* of the complaining witness was offered not for the purpose of showing that she had actually engaged in past sexual behavior, but rather for the limited purpose of showing that she had not been consistent "on the central issue in the case[.]"[33] We explained:

> The trial court's apparent concern over application of the rape shield statute resulted in another reversible error at trial. After Lynn's [one of the stepdaughter's] testimony, the defense

---

(1974) (right of confrontation violated by state statute's exclusion of evidence needed to show bias of important witness); *Washington v. Texas*, 388 U.S. 14, 23, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967) (right to present evidence violated by state statute's exclusion of co-indictees' testimony).

[31] *Carver*, 37 Wn. App. at 124.

[32] *Carver*, 37 Wn. App. at 124-25.

[33] *Carver*, 37 Wn. App. at 125. In *State v. Williams*, 79 Wn. App. 21, 26, 902 P.2d 1258 (1995), we explained this limited purpose as follows:

> A trial witness' *own* prior inconsistent statement is not offered to prove the truth of the matter asserted to the extent it is offered to cast doubt on the witness' credibility. To say that a witness' prior statement is "inconsistent" is to say it has been compared with, and found different from, the witness' trial testimony. This comparison, *without regard to the truth of either statement*, tends to cast doubt on the witness' credibility, for a person who speaks inconsistently is thought to be less credible than a person who does not. 1 *McCormick on Evidence* § 34, at 114 (John W. Strong ed., 4th ed. 1992). Thus, to the extent that a witness' *own* prior inconsistent statement is offered to cast doubt on his or her credibility, it is not offered to prove the truth of the matter asserted, it is nonhearsay, and it may be admissible "to impeach." *Webb v. [City of] Seattle*, 22 Wn.2d 596, 610, 157 P.2d 312, 158 A.L.R. 810 (1945).

(Footnote omitted).

moved to recall her for cross examination as to her prior statement to investigating authorities that she had been abused by her grandfather and nobody else. . . . Unless the interests of justice dictate otherwise, prior inconsistent statements may be used to impeach a witness. ER 613. Here, the little girl's statement that *only* her grandfather abused her is clearly inconsistent with her testimony that her stepfather abused her. As such, it is impeachment on the central issue in the case and should have been allowed.[34]

The *Carver* court's first ruling applies in this case. Carver offered evidence to explain the girls' high level of sexual knowledge, not to attack their credibility by showing a propensity for sexual conduct. Analogously, Horton offered evidence to rebut the State's implication that he had caused "penetrating trauma" to S.S.'s hymen, not to show that S.S. had a propensity for sexual conduct.

The *Carver* court's second holding also applies here. Carver offered evidence of a witness' prior statement to investigating authorities not to show that she had engaged in sexual conduct at some earlier time, but to show that she was testifying inaccurately at the time of trial. Analogously, Horton offered S.S.'s prior statements to Hughes and White not to show that S.S. had engaged in sexual conduct at some earlier time, but to show that she was testifying inaccurately at the time of trial; he wanted the jury to compare her prior statements to her trial testimony, find a significant inconsistency, and thus doubt her credibility. For all these reasons, we conclude that the State's reliance on RCW 9A.44.020 is misplaced; that defense counsel could have impeached S.S. if she had complied with ER 613(b); and that defense counsel's failure to comply with ER 613(b) constituted deficient performance under the particular circumstances here.[35]

---

[34] *Carver*, 37 Wn. App. at 125.

[35] We emphasize, though our discussion should already have made it obvious, that failure to comply with ER 613(b) is not *always* deficient performance. Whether it is or is not depends on the particular facts and circumstances of each case.

## B.

██ Horton also alleges deficient performance because defense counsel failed to object when, in closing argument, the prosecutor said that he personally believed Horton was lying. The prosecutor told the jury: "Then you have the defendant. The manner in which he testified, the State believes, this prosecutor believes, that he got up there and lied."[36]

In general, a prosecutor errs by expressing a "personal opinion about the credibility of a witness and the guilt or innocence of the accused[.]"[37] Just as it "is improper for a prosecutor personally to vouch for the credibility of a witness[,]"[38] it is improper for a prosecutor to personally vouch against the credibility of a witness.

The State concedes error here. Referring to the argument just quoted, it says in its brief that the "argument was improper, a timely objection would have been sustained, and there is likely no legitimate strategic reason for not objecting. In other words, trial counsel's performance was deficient for failing to object to this statement."[39] Agreeing, we hold that defense counsel performed deficiently by not objecting to this flagrantly improper argument.

## II.

██ The remaining question is prejudice. It requires "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

---

[36] RP at 514.

[37] *State v. Sargent,* 40 Wn. App. 340, 343-44, 698 P.2d 598 (1985), *rev'd on other grounds,* 111 Wn.2d 641, 762 P.2d 1127 (1988); *State v. Reed,* 102 Wn.2d 140, 145, 684 P.2d 699 (1984); *State v. Case,* 49 Wn.2d 66, 68, 298 P.2d 500 (1956) (this is "an attempt to impress upon the jury the [prosecutor's] personal belief in the defendant's guilt. As such, it was not only unethical but extremely prejudicial").

[38] *State v. Brett,* 126 Wn.2d 136, 175, 892 P.2d 29 (1995), *cert. denied,* 516 U.S. 1121 (1996).

[39] PRP Br. of Resp't at 14.

different."[40] In other words, counsel's deficiencies must have adversely affected the defendant's right to fair trial[41] to an extent that "undermine[s] confidence in the outcome."[42]

This record shows prejudice. When S.S. testified—at the State's instance—that she had never had sexual intercourse with anyone but Horton, she necessarily implied that Horton was the source of the "penetrating trauma" to her hymen.[43] Defense counsel could have defused the implication, at least in part, by presenting evidence that S.S. had earlier made inconsistent statements not to one, but to two, persons whose credibility would have been hard to assail on that point—White, a presumably neutral CPS investigator, and Hughes, S.S.'s longtime friend. Counsel lost the opportunity to do that when she failed to comply with ER 613(b), and the resulting void was extremely detrimental to Horton's position at trial. The problem was significantly exacerbated when the experienced prosecutor injected his personal opinion that Horton was lying, and defense counsel neither objected nor sought a corrective instruction. Taking all these circumstances into account, there was a "reasonable probability" that the result would have been different absent counsel's errors, and our confidence in the outcome has been undermined. We conclude that Horton has shown both deficient performance and resulting prejudice; that he received ineffective assistance from counsel; and that a new trial is required.

Before closing, we note two Indiana cases in which the court reached the same result on similar facts. In *Wright v. State*,[44] the defendant was charged with molesting his seven-year-old stepdaughter. After the victim testified at

[40] *Strickland v. Washington*, 466 U.S. 668, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

[41] *State v. Thomas*, 109 Wn.2d 222, 225-26, 743 P.2d 816 (1987) (quoting *Strickland*, 466 U.S. at 687).

[42] *Strickland*, 466 U.S. at 694; *Brett*, 126 Wn.2d at 199.

[43] CP at 135.

[44] 581 N.E.2d 978 (Ind. Ct. App. 1991).

trial that the defendant had indeed molested her, defense counsel wanted to call an extrinsic witness named Herring. According to the court's opinion,

> Herring was to testify as to a prior inconsistent statement given by the victim. The State objected and made a motion in limine to prevent Herring from testifying to any prior inconsistent statements made by the victim. The State claimed that defense had failed to lay a proper foundation for these statements by failing to cross-examine the victim first as to the prior inconsistent statements. The trial court granted the motion in limine and stated that the testimony would have been permitted if defense had laid a proper foundation.[45]

When the defendant claimed ineffective assistance on appeal, the appellate court ruled:

> Here, defense counsel actually possessed evidence to impeach the testimony of the victim. This was the only evidence that defense counsel possessed to impeach the credibility of the witness. However, defense counsel blundered in getting Herring's testimony into evidence by failing to lay a proper foundation for the testimony. Due to the fact that the victim's credibility was the major factor in the case, it was crucial for the defense to admit any evidence that would have questioned her credibility. Defense's failure to get this evidence admitted resulted in severe prejudice to the defendant. This amounts to ineffective assistance of counsel.[46]

In *Ellyson v. State*,[47] the defendant was charged with raping his wife and burglarizing her home. She gave the only direct testimony against him. Although defense counsel tried to admit her prior inconsistent statements, he failed because he had not laid the required foundation. Finding ineffective assistance, the Indiana Court of Appeals reversed.

---

[45] 581 N.E.2d at 979.

[46] 581 N.E.2d at 980.

[47] 603 N.E.2d 1369 (Ind. Ct. App. 1992).

Finding ineffective assistance here, we grant the petition, vacate the judgment and remand for new trial.

HOUGHTON and BRIDGEWATER, JJ., concur.